EXHIBIT “B”

**EXPERT DECLARATION OF PROFESSOR TODD ZYWICKI**

1.

My name is Todd Zywicki. I am the George Mason Foundation Professor of Law at the Antonin Scalia Law School at George Mason University in Arlington, Virginia. I have published academic papers on a range of subjects, including specifically laws governing presidential elections and transitions. *See* Todd Zywicki, *The Law of Presidential Transitions and the 2000 Election*, 2001 BYU L. Rev. 1573 (2001), available at https://digitalcommons.law.byu.edu/lawreview/vol2001/iss4/3/.[1] On December 4, 2000, while the Bush-Gore election dispute was ongoing, I was invited to testify before Congress on the law governing presidential elections and transitions.[2] I have also practiced law in the State of Georgia. My full curriculum vitae is attached hereto as **Exhibit A.**

2.

I have been asked to render an expert opinion with respect to the reasonableness and propriety of the casting of contingent presidential electoral votes when a judicial contest to a Presidential election has been filed under the Georgia Election Code but has not been decided as of the date that the Presidential Electors are required by the federal Electoral Count Act ("ECA") to meet and cast their votes. I have also been asked to

---

[1] *See also* Michael T. Morley, *Ascertaining the President-Elect Under the Presidential Transition Act*, 74 STAN. L. REV. May 2022), *available in* https://www.stanfordlawreview.org/online/ascertaining-the-president-elect-under-the-presidential-transition-act/ (referring to my article as "the most comprehensive analysis of the issue" of the process to "ascertain" the results of a presidential election).

[2] Testimony before United States House of Representatives, Committee on Government Reform, Subcommittee on Government Management, Information, and Technology, on "Transitioning to a New Administration: Can the Next President Be Ready?" (Dec. 4, 2000).

render an expert opinion with respect to the reasonableness and propriety of actions taken by the 2020 Republican nominees for Presidential Elector when confronted with an unresolved judicial contest to a presidential election on the date that the Presidential Electors were required to meet.

3.

The Georgia Election Code provides that the Georgia Presidential Electors be elected in 1964 and every four years thereafter in the General Election, which is held the first Tuesday after the first Monday in November. *See* O.C.G.A. § 21-2-10.

4.

The U.S. Constitution provides that "[t]he Congress may determine the time of choosing the [presidential] electors, and the day on which they shall give their votes; which day shall be the same throughout the United States." *See* U.S. CONST. art. II, § 1; U.S. CONST, Amendment 12. The Electoral Count Act ("ECA"), in turn, requires Presidential Electors to meet in their respective states on the first Monday after the second Wednesday in December of each Presidential election year and cast their votes for President and Vice President.[3] *See* 3 U.S.C. §§ 7-8.

5.

The date set by the ECA for the Presidential Electors to meet and vote was presumably selected by Congress with the intent of allowing sufficient time for States to count their votes in the Presidential election and then certify the appropriate slate of Presidential Electors (i.e., the Presidential Electors for the party whose candidate received the most votes for President).

[3] In the 2020 presidential election, this date was December 14, 2020.

6.

When election results have been certified but a judicial contest to that election is still pending, Georgia law provides that contingent commissions may be issued to the person who was apparently elected and that such person may take office. O.C.G.A. § 21-2-503(a) (permitting the issuance of a commission to a person who appears to have been elected to office "notwithstanding the fact that the election of such person to any office may be contested in the manner provided by this chapter."); *see also* O.C.G.A. § 21-2-503(c) ("Upon the certification of the results of the election, a person elected to a federal, state, or county office may be sworn into office notwithstanding that the election of such person may be contested in the manner provided by this chapter.")

7.

That same Code section just as explicitly makes the validity of such a commission contingent on the ultimate outcome of the judicial contest. Specifically, O.C.G.A. § 21-2-503(a) provides that "[w]henever it shall appear, by the final judgment of the proper tribunal having jurisdiction of a contested election, *that the person to whom such commission shall have been issued has not been elected legally to the office for which he or she has been commissioned, then a commission shall be issued to the person who shall appear to be elected legally to such office.*" (Emphasis added). The statute goes on to state that "[t]he issuing of such commission *shall nullify the commission already issued.*" *Id.* (Emphasis added).[4]

[4] Additionally, O.C.G.A. § 21-2-503(c) further provides that "[u]pon the final judgment of the proper tribunal having jurisdiction of a contested election which orders a second election or declares that another person was legally elected to the office, *the person sworn into such office shall cease to hold the office and shall cease to exercise the powers, duties, and privileges of the office immediately.*" (Emphasis added).

8.

Upon the filing of an action contesting a Presidential election under the Georgia Election Code, then, *both* the certified (but contested) Presidential Electors and the uncertified (but contesting) Presidential Electors become contingent Presidential Electors by operation of law. Where litigation is still pending and will not be resolved by a "final judgment of the proper tribunal" by the time the Presidential Electors are required to meet and vote by the ECA, the state faces a dilemma. If the state attempts to short-circuit the election contest before final resolution of the claims in the case, it would deny the candidates, the voters, and the public an opportunity to have disputes regarding the election adjudicated, which is contrary to Georgia and federal law. If the state certifies the contingent winner as the actual and final winner on or before the date set forth in the ECA for presidential electors to cast their ballots it would deprive the state of all of its electoral votes should the contesting candidate ultimately prevail in his or her judicial contest, which is also contrary to Georgia and federal law. In such circumstances, and to avoid these unlawful and unintended consequences, both sets of Presidential Electors could execute their respective ballots on the date required by federal law, with the State ultimately certifying the election for whichever candidate prevails in the judicial election contest.

9.

When faced with this dilemma, the best and most prudent way to ensure that Georgia has valid presidential electoral ballots for Congress to count would be for both sets of contingent Presidential Electors to meet and cast their votes for President and Vice President in the required format. Both sets should fulfill their duties and complete, execute, and submit the required paperwork as prescribed by the Constitution and the ECA as though the election contest had been adjudicated in each of their favor. Given the disagreeable nature of the first two alternatives (either short-circuiting electoral challenges or risking being unrepresented in the Presidential election), this option of certifying contingent slates of electors offers a reasonable, proper and lawful solution to the problem. Both sets of contingent Presidential Electors performing their duties as though the unresolved judicial contest had been (or will be) adjudicated in their favor is entirely consistent with both federal and Georgia law, and it is the only way to assure that the State of Georgia would have valid presidential electoral votes available to be counted by Congress regardless of the ultimate outcome of the judicial election challenge. The lawfulness, reasonableness and propriety of this solution is supported by state and federal law[5] and further evidenced by a review of historical precedent where that solution has been offered.

---

[5] In addition to the Georgia law outlined herein, the ECA specifically anticipates that Congress may, at times, receive two competing presidential electoral ballots from one state. The federal statute is plain that there is nothing improper about the submission of two slates and that the decision of which of these two competing slates is to be counted must be resolved solely by Congress. *See* 3 U.S.C. § 15 ("If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate*, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of

10.

In several presidential elections throughout history, including most recently in the contested elections of 1960, 2000, and 2020, judicial challenges to the presidential election had not been finally adjudicated either on or immediately prior to the date that the ECA requires the Presidential Electors to cast their votes. In each of these elections, the question has arisen as to the appropriate and lawful actions that must be taken to preserve the ability of both presidential candidates and the state itself to have valid presidential electoral votes available to be ultimately counted by Congress regardless of the ultimate outcome of the vote count or judicial challenge. The clear (and historically uncontroversial) legal answer in each of these circumstances is that both sets of the Presidential Electors should meet, vote, and transmit ballots to Congress to preserve the ability of that state to have valid electoral votes that can be counted by Congress.

11.

---

a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law*; and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State*, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*) (emphasis added).

In the 1960 presidential election, for example, Richard Nixon, the Republican candidate, was initially certified by the State of Hawaii as having carried the state. Supporters of John F. Kennedy, the Democrat presidential candidate, filed a legal action contesting the election and charging voting irregularities in 198 of Hawaii's 240 precincts, including the claim that there were more votes counted in the presidential election contest than were actually cast and that 1,283 ballots were unaccounted for in the final tabulation. That election contest was still pending and unresolved on December 19, 1960, when the Presidential Electors were required by the ECA to meet and cast their votes. Accordingly, both sets of Presidential Electors -- the certified (but contested) Republican/Nixon electors and the uncertified (but contesting) Democratic/Kennedy electors -- met separately at the Hawaii state capitol building and each cast their votes for their respective candidates in the same manner and form as though their candidate had won the state.

12.

Ultimately, on December 30, 1960, John F. Kennedy prevailed in the judicial contest, and the election was re-certified in his favor. On January 4, 1961, the Governor of Hawaii transmitted a second Certificate of Ascertainment on behalf of the state reporting that as a result of the lawsuit, the electoral votes of Hawaii were to be recorded for Kennedy rather than Nixon. Because the Democratic Presidential Electors had cast ballots back on December 19, 1960 in the precise form required by the Constitution and the ECA, Congress was able to and did count the votes from Hawaii when it met on January 6, 1961 to count the votes and certify the result. A copy of the paperwork completed and executed by the Hawaii Democratic Presidential Electors on December

19, 1960 and mailed to the Administrator of General Services of the United States of America on December 20, 1960 is attached as **Exhibit B.**[6]

13.

In the contested Presidential election of 2000, the concept of two contingent elector slates specifically relying on the Hawaii precedent was actively promoted by advocates for the Democratic presidential candidate, Al Gore, drawing support from noted constitutional scholars.[7]

14.

Democrat Congresswoman Patsy Mink of Hawaii publicly advocated for the submission of two elector slates from Florida to Congress in the 2000 election as follows:

> *The [Hawaii] precedent of 40 years ago suggests the means for resolving the electoral dispute in Florida: ...both slates of electors meet on December 18 and send their certificates to Congress;* the Governor of Florida send a subsequent certificate of election based on ... the decision of the court; and Congress accepts the slate of electors named by the Governor in his final certification.

*See* Statement of Representative Patsy Mink, CONGRESSIONAL RECORD, December 13, 2000 (emphasis added), available at https://www.govinfo.gov/content/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26609-2.htm.

---

[6] Two of the three Democratic Presidential Electors who executed the Hawaii electoral documents, William Heen and Gilbert Metzger, were retired federal judges and noted constitutional scholars.

[7] The judicial challenges to the 2000 election in Florida were finally adjudicated before December 18, 2020, the date the Presidential Electors were required by the ECA that year to meet and vote, so two electoral ballots were not executed and submitted from Florida in that election.

15.

In anticipation of the likelihood of a close and contested presidential election in 2020, electoral college scholars openly and publicly advocated for both sets of Presidential Electors to each cast their ballots for their respective candidates on the date required by the ECA and submit both ballots to Congress in any state where the vote count was not yet final or was subject to a pending, unresolved judicial contest. Michael Rosin and Jason Harrow argued, for example, that Hawaii's approach to dealing with the issue by having both sets of electors meet and case votes for their candidate "*should serve as a model for a close election this year or in any year.*" Michael L. Rosin and Jason Harrow, *How to Decide a Very Close Election/or Presidential Electors: Part 2* (Oct. 23, 2020), available at https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-2 (emphasis added); *see id.* (stating "the way the recount was handled by all involved [in the 1960 election in Hawaii] provides a model for how a very close election should be determined"). Rosin and Harrow went on to note that when the judicial contest eventually resulted in Kennedy being declared the winner, the state re-issued its certification: "Fortunately, because both slates of electors had voted on the proper day, there was still a chance to tell Congress which slate was actually appointed by the voters." *Id.*

16.

Rosin and Harrow further explain that although the process "feels disorderly," "in fact the dueling certificates, with the Governor later telling Congress who really won, was an excellent way to navigate a system that, for no good reason, occasionally provides too short a time to conduct a full recount in a very close election." *Id.* The authors also

point out that both sets of presidential electors executing contingent ballots in these circumstances eliminates the risk that the state could lose its presidential electoral votes altogether: "[I]f, by elector voting day, a result is still uncertain and no presidential electors from a particular state cast votes, then Congress probably cannot count any electoral votes from that state for that particular election. . . . That means if a state wants to have its electoral votes counted, but which presidential electors were appointed by the voters on election day remains uncertain . . . . *there is only one possible solution: both potentially-winning slates of electors should case elector votes on the day required while the recount continues.*" *Id.* (emphasis added).

17.

Harrow and Rosin subsequently argue that the 1960 Hawaii precedent of casting two sets of contingent electoral votes provides not only one reasonable solution to the difficulty of squaring the ECA's purported deadlines with a fair and accurate vote count, but actually provides the *best* solution to a difficult problem.[8] Even if one disagrees with that considered judgment, it makes plain that the State of Hawaii was not violating the law in 1960 by doing so, nor would subsequent sets of presidential electors be doing so by following this precedent: Harrow and Rosin were obviously not advocating for or urging some sort of criminal conspiracy in holding 1960 Hawaii up as a model for future close elections.

[8] Jason Harrow and Michael L. Rosin, *How To Decide a Very Close Election for Presidential Electors: Part 3*, TAKECARE (Oct. 28, 2020), *available in* https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-3.

18.

While the 2020 presidential election was in process, former CNN host Van Jones, an attorney, and Professor Larry Lessing of Harvard Law School similarly advocated that Presidential Electors should follow the Hawaii precedent if the election was not finally decided in their state by the date the ECA required Presidential Electors to meet and cast their votes. As they write, "Even though Richard Nixon said it should not be a precedent, what he did in 1960 *should be the model for this election* in 2020." Doing so would allow the state to take its time "to have an orderly and complete vote count." In particular, they described the execution of both sets of presidential ballots a "genius legal insight," noting that "*the only way their votes could matter was if they were cast on the day that Congress had set.*" *See* Van Jones and Larry Lessing, "*WHY PENNSYLVANIA SHOULD TAKE ITS TIME COUNTING VOTES,*" *https://www.cnn.com/2020/11/04/opinions/pennsylvania-take-time-counting-votes-opinion-jones-lessig/index.html* (Nov. 4, 2020) (citing favorably to the 1960 Hawaii precedent and noting that "[t]he key – *and this is the critical fact for 2020 as well* – is that the Democratic slate had also met on December 19 and had also cast their ballots in the manner specified by the Constitution. *When they voted, no one knew whether their votes would matter. But at least someone recognized that the only way their votes could matter was if they were cast on the day that Congress had set.* History does not record who had that *genius legal insight.*") (Emphasis added).

19.

The actions taken by both sets of Presidential Electors in Hawaii in 1960 that have been lauded and advocated by elected officials and legal scholars in 2000 and 2020 are supported by and consistent with federal and Georgia law. Specifically, federal law expressly anticipates and permits the submission of more than one slate of Presidential Electors from a State, and the Constitution gives Congress exclusive jurisdiction to adjudicate the validity of those competing slates within the parameters set in the ECA and through their own internal procedures. *See* 3 U.S.C.A. § 15 and U.S. CONST. art. II, § 1.[9] *See also* COUNTING ELECTORAL VOTES: AN OVERVIEW OF PROCEDURES AT THE JOINT SESSION, INCLUDING OBJECTIONS BY MEMBERS OF CONGRESS, Congressional Research Service at pp. 8-9 (explaining Congress'

---

[9] That statute states, in pertinent part, as follows:

> If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate,* those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed. as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law;* and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by Lawful electors appointed in accordance with the laws of the State,* unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof shall be counted.*

3 U.S.C.A. § 15 (emphasis added).

process to adjudicate between two sets of presidential elector ballots from the same state), available at https://crsreports.congress.gov/product/details?prodcode=RL32717; Todd Zywicki, *The Law of Presidential Transitions and the 2000 Election*, 2001 BYU L. Rev. 1573, 1609 n. 110 (2001) ("Hawaii's situation in 1960 is also important in that it provides the primary congressional precedent for congressional procedures for resolving disputes over two competing Certificates of Ascertainment."), available at https://digitalcommons.law.byu.edu/lawreview/vol2001/iss4/3/.

20.

In 2020, Georgia was confronted with the identical dilemma as Hawaii in 1960, except that in Georgia, the Democratic candidate for President had been certified as having carried the state, and it was the Republican candidate who filed a legal action contesting the election. That judicial contest was still pending on December 14, 2020 when the Presidential Electors were required by the ECA to meet and cast their votes. Indeed, no hearing or other proceeding had even been had in that contest.

21.

Based upon the materials that I have reviewed, the contingent Georgia Republican Presidential Electors received advice of legal counsel to take the actions they took on December 14, 2020, and they followed the Hawaii precedent precisely, using materially identical forms and the same procedures as the contingent 1960 Hawaii Democratic Presidential Electors. At the same time, the contingent Georgia Republican Presidential Electors publicly announced that the votes they cast and related actions they took were expressly contingent on the outcome of the pending election contest and were cast only to protect and preserve the remedies for that contest and the ability of the

State of Georgia to have a valid electoral ballot for Congress to count on January 6, 2021 regardless of the ultimate outcome that contest.

22.

Legally, the Georgia Democratic Presidential Electors were also acting contingently in casting their votes, as their status as Presidential Electors was directly contingent on the outcome of the pending judicial contest to the election. Despite this fact, the Georgia Democratic Presidential Electors made no similar announcement that their votes and actions on December 14, 2020 were contingent on the outcome of the election contest. They, however, have come under no criticism or scrutiny for having not done so.

23.

Based upon the Hawaii precedent as well as federal and Georgia law, when contingent Presidential Electors execute contingent electoral ballots under these circumstances, they are not required to insert into those ballots any reference to the pending election contest or that they are executing their ballots provisionally or contingently. Indeed, the insertion of such additional or surplus language into the Presidential Elector's ballots could render them subject to validity challenges. And by operation of Georgia and federal law, their contingent nature is obvious on their face.

24.

Tellingly, the contingent 1960 Hawaii Democratic Electors included no such reference in the certificates they executed. Instead, in their documents, they declared themselves to be "duly and legally appointed and qualified" and "certified by the Executive" even though they had not been so certified as of the date the certificates were executed. Additionally, they stated in those documents that "We hereby certify that the

lists of all the votes of the state of Hawaii given for President, and of all the votes given for Vice President, are contained herein." *See* Exhibit B. As noted, those ballots were ultimately the ones that Congress officially counted as the official electoral votes of Hawaii for the 1960 presidential election.

25.

Accordingly, the fact that the 2020 electoral ballots cast by the contingent Georgia Republican Presidential Electors did not include any explicit reference to the pending election challenge or the contingent nature of the ballots does not render them false or invalid. Instead, these ballots, which were prepared by and in the specific form advised by legal counsel, were in exactly the correct and necessary format for the contingent Georgia Republican Electors to perform their duties legally and validly as prescribed by the Constitution, federal and Georgia law.

26.

As noted, the 2020 Georgia Democratic Electors were also acting contingently when they met and voted. The Democrats also (appropriately) did not include any reference to the pending judicial election contest or the contingent nature of the ballots they were executing in their documents. Instead, both sets of contingent Presidential Electors by necessity completed and executed the requisite paperwork as prescribed by law and as though they possessed uncontested certificates at that time of execution.

27.

Additionally, transmission of the contingent Republican electoral ballots to Congress (and to the other entities required to receive them) at the time that they are executed is part of the legally required process under federal law to ensure that the ballots are valid and available to be counted by Congress if the judicial contest changes

the outcome of the election. In the 1960 Hawaii example, the contingent Democratic Presidential Electors not only executed their ballots as provided by federal law, but they also transmitted them to Congress and as otherwise required by federal law at the time that they executed them. Failure to transmit the ballots as required by law would put the validity of the electoral ballots at issue.

28.

The fact that there was a recount ordered by the court in the 1960 Hawaii election is irrelevant and does not distinguish the 1960 Hawaii situation from the 2020 presidential election in Georgia in any legally material way. The legally relevant point is that a judicial challenge was filed in Hawaii in 1960, that challenge was pending and unresolved at the time federal law required the presidential electors to cast their ballots. As a result, to preserve Hawaii's ability to have their electoral votes counted regardless of the ultimate outcome of the judicial challenge, both sets of presidential electors lawfully, prudently, and appropriately cast their ballots. In Hawaii, the court took action in response to that challenge, and the court ultimately entered judgment for the challenger, John Kennedy, and declared him the winner of the election. One of the steps to that result happened to be a recount, but that fact specific to the Hawaii situation has no legal relevance to the 2020 election challenge in Georgia that was pending when the electors were required to act on December 14, 2020. In Georgia, unlike in Hawaii (and contrary to Georgia law requiring a timely consideration), the court took *no* action on the pending election challenge – it did not even schedule a timely hearing, much less assess any of the evidence to determine what steps (such as a recount) may be necessary to adjudicate the challenge. Georgia's court could have ordered a recount, assessed the merits of the evidence submitted with the complaint in that case, or taken any number

of other actions to adjudicate the matter, up to and including declaring Trump as the actual winner of the Georgia election. The fact that the Hawaii court acted rapidly to resolve the pending issues and the Georgia court dragged its feet bears no legal or logical relevance as to the precedential value of the 1960 Hawaii election or to the propriety of the actions taken by Georgia s presidential electors on December 14, 2020, the date mandated by the ECA. And regardless, because the result of the litigation and any subsequent remedy the court might order remained unresolved as of that date, neither set of Georgia's 2020 presidential electors could have known on December 14, 2020 what actions the court would or would not take (including but not limited to ordering a recount) in adjudicating the election challenge or what the ultimate outcome of that challenge would be.

29.

In light of the 1960 Hawaii precedent and the widespread support from elected officials and legal scholars that the execution and submission of both presidential electoral ballots in a close election has received since then, reasonable attorneys could not have predicted that a presidential elector in 2020 taking the same actions taken in Hawaii in 1960 could or would be viewed anything but entirely proper; certainly they could not have reasonably predicted that any law enforcement official would ever suggest that any or all of these actions were criminal. Given the difficulties presented under current laws, the actions taken by the state of Georgia were the best available means for addressing extended electoral challenges that remain unresolved by the relevant deadlines. Once the challenges are resolved, the appropriate response should be for the State to disregard the losing slate of electors and certify the winning slate; there is no basis to criminally prosecute those who acted to ensure the state's electoral votes

would be counted in the event that known but unresolved election contests remain pending as of the deadline.[10]

30.

Based on my analysis of the historical record, particularly the example of the 1960 Hawaii election, it is my expert opinion that the contingent Republican Presidential Electors in Georgia in 2020 acted in a reasonable, proper, and lawful manner. Moreover, it is my opinion, shared by a consensus of experts who have considered the issue over the past several decades, that the casting of contingent electoral votes is not only reasonable, proper and lawful, but the best approach available to enable the resolution of election contests while preserving the ability of a state to have its electoral votes counted by Congress should a judicial contest change the outcome of the election. In conclusion, it is my opinion that the actions taken by the contingent Georgia Republican Presidential Electors *were* lawful, reasonable, proper, and necessary, and any suggestion that they could be "criminal" ignores legal and historical precedent, the reasoned advice of legal counsel received, and the plain language of the Constitution, federal and Georgia law.

[10] Although a full discussion of the constitutional implications of any State taking such action against its Presidential Electors is beyond the scope of this declaration, it is worth noting that the actions taken by the Republican presidential elector nominees in Georgia in 2020 enjoy broad constitutional protection, regardless of the Hawaii precedent.

Signed this day 11th July, 2023.

Todd Zywicki
George Mason Foundation of Profession of Law
Antonin Scalia School of Law
George Mason University
3301 Fairfax Drive
Arlington, VA 22201